Peter De La Mora                                          March 11, 2021

```
  1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
  2                     HOUSTON DIVISION

  3   COLE & ASHCROFT, LP DBA        )
      SHUTTERS PLUS,                 )
  4                                  )
                    Plaintiff,       )
  5                                  )
      VS.                            ) CIVIL ACTION NO.
  6                                  ) 4:20-cv-03507
      STATE AUTOMOBILE MUTUAL        )
  7   INSURANCE COMPANY,             )
                                     )
  8                 Defendant.       )

  9

 10       ----------------------------------

 11          REMOTE ORAL DEPOSITION OF

 12             PETER DE LA MORA

 13              MARCH 11, 2021

 14       ----------------------------------

 15

 16       REMOTE ORAL DEPOSITION OF PETER DE LA MORA,

 17   produced as a witness at the instance of the DEFENDANT,

 18   and duly sworn, was taken in the above-styled and

 19   -numbered cause on March 11, 2021, from 11:04 a.m. to

 20   12:13 p.m., via Zoom, before Mercedes Arellano, CSR in

 21   and for the State of Texas, reported by machine

 22   shorthand, in Dallas County, Texas, pursuant to the

 23   Federal Rules of Civil Procedure and the current

 24   emergency order regarding the COVID-19 State of

 25   Disaster.
```

**DEFENDANT'S
EXHIBIT I**

```
 1              R E M O T E   A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3        Mr. Derek L. Fadner
          MCCLENNY MOSELEY & ASSOCIATES, PLLC
 4        516 Heights Boulevard
          Houston, Texas   77007
 5        (844) 662-7552
          (713) 322-5953 (fax)
 6        Derek@mma-pllc.com

 7

 8   FOR THE DEFENDANT:

 9        Mr. Patrick M. Kemp
          SEGAL MCCAMBRIDGE SINGER & MAHONEY
10        100 Congress Avenue
          Suite 800
11        Austin, Texas   78701
          (512) 476-7834
12        (512) 476-7832 (fax)
          Pkemp@smsm.com

13

14
     ALSO PRESENT:
15
     Mr. Robert Mendoza, Kim Tindall & Associates' Zoom Host
16

17

18

19

20                  REPORTER'S NOTE

21        Uh-huh = Yes - Affirmative response

22        Huh-uh = No  - Negative response

23     Quotation marks are used for clarity and do not

24          necessarily indicate a direct quote.

25
```

Peter De La Mora                                    March 11, 2021
                                                           Page 4

```
 1                   P R O C E E D I N G S
 2                   (All parties present have hereby waived the
 3   necessity of the reading of the statements by the
 4   stenographer according to Rule 30(b)(5).)
 5                   THE STENOGRAPHER:  We are now on the record
 6   for the Zoom deposition of Peter De La Mora.  The date
 7   is March 11th, 2021.  The time is 11:04 a.m.
 8                   Will everyone please state their name,
 9   their location, and if counsel will please state who
10   they represent.
11                   MR. KEMP:  Patrick --
12                   MR. FADNER:  Good morning -- oh.  Go ahead,
13   Patrick.
14                   MR. KEMP:  Patrick Kemp.  I represent State
15   Automobile Mutual Insurance Company, appearing from
16   Austin, Texas.
17                   MR. FADNER:  And good morning.  Derek
18   Fadner, and I represent Cole & Ashcroft, the plaintiffs
19   in this case.  And I'm appearing from Houston, Texas.
20                   THE WITNESS:  I am Peter De La Mora.  I'm
21   the expert witness.
22                   THE STENOGRAPHER:  And where are you
23   located, Mr. De La Mora?
24                   THE WITNESS:  I'm located in Houston, in my
25   office in Houston, Texas.
```

 1                  THE STENOGRAPHER:  Are there any further

 2   agreements on the record?

 3                  MR. KEMP:  No.

 4                     PETER DE LA MORA,

 5   having been first duly sworn, testified as follows:

 6                        EXAMINATION

 7   BY MR. KEMP:

 8       Q.  Sir, would you please state your full name for

 9   the record.

10       A.  Peter De La Mora.

11       Q.  All right, sir.  You've given your deposition a

12   number of times in the past, correct?

13       A.  Yes.

14       Q.  All right.  Have you been retained as an expert

15   in this case?

16       A.  Yes.

17       Q.  By who?

18       A.  By the Fadner -- by Mr. Fadner and McClenny

19   Moseley & Associates.

20       Q.  Okay.  So you were retained by Derek Fadner on

21   behalf of the plaintiff, correct, Cole & Ashcroft, LP?

22       A.  Correct.

23       Q.  All right.  And you were retained to conduct

24   a -- an assessment of the building at 5631 Brystone

25   Drive, Houston, Texas 77041?

 1        A.   Correct.

 2        Q.   Okay.  And you were given dates of loss of two

 3   claims; one being 8/28/2017 for Hurricane Harvey and the

 4   other being May 9, 2019, for a -- for a hail claim,

 5   right?

 6        A.   That's correct.

 7        Q.   All right.  And you've been re- -- you were

 8   retained for both of those claims, correct, as an

 9   expert?

10        A.   That's correct.

11        Q.   Okay.  What is your fee agreement with McClenny

12   and Moseley and Cole & Ashcroft?

13        A.   I bill $240 an hour.

14        Q.   Okay.

15        A.   And they pay for the time that I spend working

16   on the -- on the job.

17        Q.   All right.  How much time have you billed

18   on -- to Cole & Ashcroft for Derek Fadner on this -- on

19   this matter?

20        A.   I don't have that handy.  I can get it, but...

21        Q.   Okay.  Well, let me ask you this:  How much

22   time have you spent preparing for your deposition today?

23        A.   Probably about two hours yesterday afternoon

24   and about one hour this morning.

25        Q.   What did you do yesterday afternoon?

Peter De La Mora                                        March 11, 2021
                                                              Page 7

 1        A.  I just went through my file, and then again

 2   this morning.

 3        Q.  And you say you went through your file, what

 4   specifically did you do in your file?

 5        A.  Basically, read the report.  I hadn't seen it

 6   in a while, so I -- I read it a couple times.  I -- I've

 7   looked at the photograph on the computer and the

 8   photographs that we have on the -- on the report.

 9        Q.  All right.  And when you say your "report," are

10   you referring to the report that you stamped and signed

11   November 8, 2019?

12        A.  That's correct.

13        Q.  That's the only report that you've prepared,

14   correct?

15        A.  That's right.

16        Q.  Have you been asked to prepare any other

17   reports?

18        A.  Not to date.

19        Q.  Does the report of November 8, 2019, contain

20   all of your professional opinions?

21        A.  It does.

22        Q.  All right.  Let's talk a little bit about your

23   background, sir -- well, let me back up.

24              Did you speak with Mr. Derek Fadner or

25   anyone with McClenny and Moseley about your depo today?

Peter De La Mora

March 11, 2021
Page 8

```
 1        A.   Just this morning, briefly.
 2        Q.   You spoke with Mr. Fadner today?
 3        A.   Yes.
 4        Q.   Have you spoken with him before about this
 5   matter?
 6        A.   No.  Not that I can remember, anyway.
 7        Q.   What -- what did you speak with him today
 8   about?
 9        A.   He just asked me if I had gone through my
10   report and if I was ready for the deposition.  I -- I
11   said yes.
12        Q.   About how long did you speak with him?
13             THE STENOGRAPHER:  I don't think he heard
14   you.  You did sound a little muffled.
15        Q.   (BY MR. KEMP)  About how long did --
16        A.   Maybe I'm a little far from the...
17        Q.   I'll try to speak louder.
18        A.   Any better?
19        Q.   Okay.  I can see and hear you fine.  It sounds
20   like you didn't hear me.
21             How long did you speak with Mr. Fadner
22   today?
23        A.   Not long.  Just a few minutes each time.
24        Q.   Each time?  Oh, I thought you said --
25        A.   Yesterday and -- and this morning.
```

1      A.  If it was done prior to the hurricane, no, it

2  wouldn't change my opinion because I can see the -- we

3  haven't had a -- any kind of a wind storm in the last

4  few years.  And that tar didn't look very old.  And

5  the -- the -- you still have a lot of separation on the

6  seams and the overlap joints.

7      Q.  All right.  So the tarring is an indication

8  that they had been dealing with leaks, correct?

9      A.  Well, the tar's an indication to me that

10  they -- the -- yeah, that they had to stop some leaks.

11      Q.  Right.  But if the -- if they had to stop some

12  leaks from prior to the date of the hurricane, that --

13  that doesn't change your opinion that -- that the roof

14  needs to be replaced totally as a result of Hurricane

15  Harvey, right?

16      A.  That's correct.

17      Q.  There were a number of other conditions besides

18  wind that were noted on the roofs, such as crimps on the

19  roof from foot traffic -- well, I guess that -- what --

20  what we've been calling tar, is that what you refer to

21  in the report as "sealant" being applied?

22      A.  Correct.

23      Q.  Okay.  So like "sealing applied to flashing of

24  rear building wall," that's -- that's an effort for

25  somebody to stop a leak, right?

 1        A.   That's correct.

 2        Q.   So you -- you've got a number of references to

 3   crimps from foot traffic, some dents from hail; you've

 4   got sealant in various areas; you've got blown-off seam

 5   gaskets, wind displaced closure strips, screws covered

 6   with sealant, screws that have been -- I guess are

 7   missing at -- at various places.  Right?

 8             All of those things -- you put all of

 9   those things into account, correct, and -- and concluded

10   it was wind from Hurricane Harvey, right?

11        A.   That's correct.  It's very consistent with

12   that.

13        Q.   Now, let's talk about the -- the crimps.

14   You're not saying that crimps from foot traffic were

15   wind from Hurricane Harvey, are you?

16        A.   Of course not.  I'm not saying that you have to

17   do anything about those crimps either.

18        Q.   Okay.  Nothing really needs to be done about

19   crimps?

20        A.   No.  That happens once in a while when -- when

21   people don't think that they have to step on the high

22   points of the roof, rather than on the flat section of

23   it.

24        Q.   I understand.  I think I understand what you're

25   saying.  You're saying those crimps are caused when

1  someone steps on the lower flat portion that's not

2  supported as well, correct?

3       A.  No.  When they step on the -- on the -- on

4  the lifted -- the top sections, they -- the...

5       Q.  The seams?

6       A.  The seams.

7       Q.  Oh, so people walk on the seams?

8       A.  Yeah.  They should walk on the flat section.

9  When you walk on metal roofs, you walk on the flat

10 section.  Because if you step on the seams, that's what

11 you do, you crimp them.

12      Q.  Okay.  But those don't -- those crimps are --

13 are just cosmetic.  They don't need repairs, right?

14      A.  That's correct.

15      Q.  Okay.  And you -- you noted some -- some hail

16 dents, too.  You feel the same about hail dents?

17      A.  Some of the hail dents are just cosmetic.  Some

18 of them when the -- if they -- if they hit the seams,

19 then they can cause damage.  But normally, on the -- on

20 the flat sections, they're -- they're okay.

21      Q.  "They're okay," meaning they're just cosmetic?

22      A.  Meaning that they're just a -- a little dimple

23 on the thing.

24      Q.  I'm sorry.  I didn't hear the last part.  It

25 may be --

 1        A.   Maybe a little dimple on the metal.  It's

 2   not -- you know, just a small -- small dents like those

 3   are not going to affect the -- the function of the roof

 4   unless they hit the seams.

 5        Q.   Did you find any that hit the seams that caused

 6   functional damage?

 7        A.   You know, there's always some that hit the

 8   seams.  I mean, hail doesn't have a name.  It just comes

 9   down.

10             Photograph 22 shows it -- they hit on a

11   seam.  But...

12        Q.   The -- the photo that I have of yours that's

13   marked Photo 22 says, "Office roof sealing applied to

14   roof bent jack."

15        A.   That's correct.  Or around the bent jack,

16   actually.

17        Q.   You're saying Photograph 22 shows they had a

18   dent from hail?

19        A.   No.  That was probably wind damage.

20        Q.   Okay.  So Photo 22 is wind damage, right?

21        A.   Correct.

22        Q.   Okay.  So that Photo 22 shows a bunch of

23   sealant around the roof penetration then, right?

24        A.   Yes, correct.

25        Q.   And so are you saying the sealant itself

1  establishes that there was wind damage?

2      A.   No.   The sealant establishes that there was

3  some damage at the place where the pipe goes through.

4  And the pipe, the -- probably broke the jack, the rubber

5  jack.

6      Q.   And your opinion is based on looking at this

7  photograph -- based on looking at this photograph and

8  seeing the sealant?

9      A.   Pardon?

10     Q.   I -- I'm trying to understand what's the basis

11 of your opinion.   You stated that Photograph 22 states,

12 "Office roof sealing -- sealant applied to roof bent

13 jack."

14     A.   Right.

15     Q.   You just told me that that is wind damage,

16 right?

17     A.   Most likely, yes.

18     Q.   Okay.   And the basis of that opinion is what?

19     A.   The basis of that opinion is that we had a

20 hurricane, and there was pretty much a lot of wind in

21 that area.   And the wind affected the roof, and the wind

22 on a roof like this makes it vibrate up and down.   And

23 that broke the seal of the -- around the pipe.   And they

24 went back and replaced it or damaged the -- the roof

25 jack, the membrane of the -- that fits, makes the

```
 1        A.   Yes.

 2        Q.   Let me go to Photo 18.  He put in yellow chalk

 3   "wind lifted," and he has an arrow there.

 4             Do you see that?

 5        A.   Yes.

 6        Q.   Is that a ridge vent flashing?

 7        A.   No.  That's the roof sheet.

 8        Q.   If you look at his comment, it -- it says "wind

 9   lifted ridge vent flashings."

10        A.   That's right.  It is.  Sorry.

11        Q.   Okay.  Do you agree it's a wind lifted --

12        A.   Yeah.  The -- no, I was looking at the

13   photograph above to see what it was -- what it was, and

14   the -- it is ridge vent flashing.  And then you have

15   the -- the roof vents on top of it.

16        Q.   Okay.  And -- and that's wind damage?

17        A.   That separate region is wind damage, yes.  I

18   think you may be confusing the flashing for the vent

19   with the -- with the hip -- with the -- with the

20   flashing for the roof from the hip.

21        Q.   Are you saying that I'm confusing it or that

22   the person who took this photograph and made this

23   comment is confusing it?

24        A.   No.  You have -- the ridge vent flashing is to

25   the left.  If you look at the photograph to the left of
```

Peter De La Mora                                   March 11, 2021
                                                        Page 39

 1  the -- of the vent -- of that vent or whatever equipment
 2  is there -- it maybe air-conditioning.  I'm not -- I
 3  really don't know by just looking at it.
 4            But yeah, there's a -- there's a flashing
 5  for the -- for the equipment.  And then to the left of
 6  that, there's ridge vent flashing.  And that's where
 7  he's showing the -- the lifted section.
 8       Q.  And in your opinion, that -- that is a -- a
 9  wind damage lifted section that requires repair, right?
10       A.  Correct.
11       Q.  All right.
12       A.  Well --
13       Q.  Now he is --
14       A.  -- that's your opinion, that it requires
15  repair.  My opinion is that the roof needs to be
16  replaced.
17       Q.  Well, I understand.  You -- your opinion is the
18  entire roof needs to be replaced as a result of
19  Hurricane Harvey from wind, right?
20       A.  Correct.
21       Q.  And it cannot be repaired.  Is that your
22  opinion?
23       A.  That's correct.
24       Q.  All right, sir.  I'm looking at Photo 20 from
25  the public adjustor's photographs.  Again, he just

Peter De La Mora                                    March 11, 2021
                                                        Page 40

1  checked yellow chalk and put some arrow?

2      A.  That's right.

3      Q.  He states, "The high winds of Hurricane Harvey

4  caused the metal panels to lift, and in some cases,

5  bend.  This picture illustrates damage left behind.

6  This roof panel no longer sits flush.  It is now bent

7  out of shape and vulnerable -- a vulnerable entry point

8  for the elements."

9           Did you -- did I read that correctly?

10     A.  Yes.

11     Q.  All right.  Do you -- do you agree with the

12 public adjustor that that depicts wind damage?

13     A.  Yes.

14     Q.  Can you please explain how that depicts wind

15 damage from Hurricane Harvey?

16     A.  Well, you can see that's the -- the overlap

17 joint and that overlap joint should be flat and over the

18 seam completely flat, just like it is in the other

19 little one.  And it's not, it's been lifted up by the

20 wind.

21           You can also see that there's a -- a little

22 bit of indentation at the screw from the pressure

23 lifting it up, made a dent in the screw because the

24 screw held down.  It didn't pop.

25     Q.  So the dent around the screw is from the wind

Peter De La Mora

March 11, 2021
Page 49

1   photos of ceiling tiles, for example, that appear to

2   have water stains, correct?

3       A.  Correct.

4       Q.  We talked earlier about there possibly being,

5   given the age of the roof, roof leaks attributable to

6   something other than Hurricane Harvey that predated

7   Hurricane Harvey, right?

8       A.  It's possible.

9       Q.  So is -- is it your testimony -- it's possible

10  that some of the leaks predated Harvey, right?

11      A.  Yeah.  I'm sure the roof this size and this

12  age, they probably had a few little leaks here and

13  there.

14      Q.  What did you do to try and distinguish those

15  leaks that predated Hurricane Harvey?

16      A.  I can't distinguish the leaks that predated

17  Hurricane Harvey.  I don't think there's anybody that

18  can.  I mean, water is water and water comes in and

19  water leaves a stain and that's it.

20      Q.  Okay.  So you don't know if these leaks --

21  other than the fact that you said that they told you

22  after Hurricane Harvey, you don't know if any of those

23  leaks preexisted Hurricane Harvey, right?

24      A.  No.

25      Q.  But they -- they -- they had someone, a

Peter De La Mora                                    March 11, 2021
                                                        Page 50

1   maintenance man, who told you the leaks started after

2   Hurricane Harvey?

3       A.   Well, you're trying to put things in my mouth

4   that I can't answer.  Yeah, he said leaks started

5   Hurricane Harvey.  He didn't point to this leak started

6   Hurricane Harvey, and that leak was there before.

7   So...

8       Q.   Yeah, I -- I'm not trying to put words in your

9   mouth.  I thought that's what you had told me.

10      A.   I don't think I told you, but I didn't -- he

11  didn't separate leaks that were there before or after.

12  He said leaks started Hurricane Harvey, and that's very

13  reasonable, as far as I'm concerned, that leaks started

14  after Hurricane Harvey.

15              Now, were there some leaks before Hurricane

16  Harvey?  Possibly.

17      Q.   Okay, sir.  The -- let me show you another

18  photo.  I'm showing you Photo 44.  Somebody's circled in

19  white chalk, and it looks like there are two dents --

20  looks like dents on the roof and somebody wrote, M-E-C-H

21  on one.  The other doesn't have a statement.

22              But your statement Photograph 44 says,

23  "Warehouse roof, mechanical dent and hail dent."

24              Do you see that?

25      A.   Yes.

Peter De La Mora                                    March 11, 2021
                                                        Page 51

1      Q.   Who -- who -- who wrote that?  Was that your
2   roofer, Jeff Holsomback?
3      A.   No.  That was there.  But it's obvious because,
4   look, hail dent -- you can see the hail dent below
5   didn't break the surface of the finish --
6      Q.   Okay.
7      A.   -- where the mechanical dent above broke the
8   surface of the finish, and that's the difference between
9   the two.  That was hit by a sharp object.  This was hit
10  by hail.
11     Q.   Okay.  The hail didn't break the surface?
12     A.   Correct.
13     Q.   But the mechanical did -- does that mean like
14  somebody drops a sharp tool or something like that?
15     A.   Something like that.
16     Q.   Okay.  Does the roof need to be repaired
17  because of the mechanical dent that did break the
18  surface?
19     A.   Well, you just -- just have one, probably be
20  nice to put a little coating on it so you can protect
21  the base metal.  But you wouldn't change the panel
22  because of one little dent.
23     Q.   Even if it breaks the surface, you wouldn't
24  change the panel?
25     A.   No.  You take care of the break in the surface.

Peter De La Mora

March 11, 2021
Page 52

1    Q.  And there's a, what, like a product that has

2  a -- a coating that you would apply to it?

3    A.  You can -- you can apply a coating to it, yeah.

4  You can have the -- that -- they say the galvanized

5  paint that you can put in there.

6    Q.  Okay.  Mr. De La Mora, that's all the questions

7  I have for you at this time.

8              MR. KEMP:  I will pass the witness.

9              Thank you for your time.

10             THE WITNESS:  All right.  Thank you.

11             MR. FADNER:  Thank you.

12             And thank you, Mr. De La Mora.

13             And no questions at this time.  We'll

14  reserve until trial, in the event that your testimony is

15  necessary.

16             THE STENOGRAPHER:  Okay.  And quickly --

17  hold on one second.

18             Okay.  Before I announce the deposition is

19  concluded, pursuant to the Federal Rules, are there any

20  stipulations regarding custody of the transcript,

21  exhibits, and/or any other pertinent matters?

22             MR. KEMP:  There are no stipulations, I

23  don't believe, other than we waive the read-on.

24             MR. FADNER:  I agree with Counsel.

25             THE STENOGRAPHER:  Other than you waive

 1  what?  I'm sorry.

 2              MR. KEMP:  The read-on at the beginning as

 3  discussed previously.

 4              THE STENOGRAPHER:  Okay.  The time is

 5  12:13 p.m.  This is the conclusion of the Zoom

 6  deposition of Peter De La Mora.

 7              (Remote deposition concluded at 12:13 p.m.)

 8

 9              Reporter's Note:  According to Federal Rule

10  30(e)(1), the request for review of the deposition by

11  the witness is accomplished "on request by the deponent

12  or a party before the deposition is completed."

13              Since this was not done, signature is

14  considered waived for this transcript.

15

16

17

18

19

20

21

22

23

24

25

Peter De La Mora                                              March 11, 2021
                                                                   Page 54

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3  COLE & ASHCROFT, LP DBA        )
    SHUTTERS PLUS,                 )
 4                                 )
                    Plaintiff,     )
 5                                 )
    VS.                            ) CIVIL ACTION NO.
 6                                 ) 4:20-cv-03507
    STATE AUTOMOBILE MUTUAL        )
 7  INSURANCE COMPANY,             )
                                   )
 8                  Defendant.     )

 9

10              REPORTER'S CERTIFICATION
          REMOTE DEPOSITION OF PETER DE LA MORA
11                  MARCH 11, 2021

12

13       I, Mercedes Arellano, Certified Shorthand Reporter

14  in and for the State of Texas, hereby certify to the

15  following:

16       That the witness, PETER DE LA MORA, was duly sworn

17  by the officer and that the transcript of the oral

18  deposition is a true record of the testimony given by

19  the witness;

20       That examination and signature of the witness to

21  the deposition transcript was waived by the witness and

22  agreement of the parties at the time of the deposition;

23       That the original deposition was delivered to

24  MR. PATRICK M. KEMP;

25       That the amount of time used by each party at the
```

Peter De La Mora

March 11, 2021
Page 55

1    deposition is as follows:

2        Mr. Derek L. Fadner - 00 HOURS:00 MINUTE(S)

3        Mr. Patrick M. Kemp - 01 HOURS:09 MINUTE(S)

4        That $_____ is the deposition officer's

5    charges to the Party for preparing the original

6    deposition transcript and any copies of exhibits;

7        That pursuant to information given to the

8    deposition officer at the time said testimony was taken,

9    the following includes all parties of record:

10       Mr. Derek L. Fadner, Attorney for Plaintiff

11       Mr. Patrick M. Kemp, Attorney for Defendant

12       That a copy of this certificate was served on all

13   parties shown herein on _____ and filed

14   with the Clerk pursuant to Rule 203.3.

15       I further certify that I am neither counsel for,

16   related to, nor employed by any of the parties or

17   attorneys in the action in which this proceeding was

18   taken, and further that I am not financially or

19   otherwise interested in the outcome of the action.

20       Certified to by me this ___ day of March, 2021.

21

22                      _____
                        Mercedes Arellano, Texas CSR 8395
23                      Expiration Date:  January 31, 2022
                        KIM TINDALL & ASSOCIATES, LLC
24                      Firm Registration No. 631
                        16414 San Pedro, Suite 900
25                      San Antonio, Texas 78232
                        Phone 866.672.7880